IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LAURA E. TARTARO-MCGOWAN,       )
                                )
        Plaintiff,              )
                                )
    v.                          )          Civil Action No. 1:21-cv-298 (RDA/TCB)
                                )
INOVA HOME HEALTH, LLC, *et al.*, )
                                )
        Defendants.            )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Inova Home Health, LLC and Alternate Solutions Health Network's ("Defendants") Motion for Summary Judgment (Dkt. 32). The Court dispenses with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); E.D. Va. Loc. Civ. R. 7(J). The Motion is now ripe for disposition. Considering the Motion together with Defendants' memorandum in support of the Motion (Dkt. 33); Plaintiff Laura Tartaro-McGowan's ("Plaintiff") Opposition (Dkt. 34); and Defendants' Reply (Dkt. 38), it is hereby ORDERED that Defendants' Motion for Summary Judgment is GRANTED for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background

Although the parties dispute certain facts, the following material facts are either undisputed or considered in the light most favorable to Plaintiff. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (noting that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party); *see also* Defendants' Listing of Undisputed Facts (Dkt. 33 at 13-16); Plaintiff's Response to Defendants' Listing of Undisputed Facts (Dkt. 70 at 10-12).

Plaintiff Laura Tartaro-McGowan worked for Inova Home Health, a home health care agency, for many years as a clinical nurse. In this role, Plaintiff regularly administered care to patients on field visits in their homes. After her knee surgery, Plaintiff in 2017 applied for and accepted a different role with Inova Home Health—a clinical manager position. About three years after she began in this role, in the spring of 2020, the COVID-19 pandemic ensued. Dkt. 33 at 13. The early months of the pandemic provide the backdrop to this litigation.

According to Inova's description of Plaintiff's role as a clinical manager, essential functions of the job include "arrive[ing] at assigned location on scheduled work day" and "work[ing] according to designated hours and on-call as needed in office and field nursing responsibilities." *Id.* Furthermore, "complet[ing] field visits as needed providing direct patient care upon Administrator discretion" is a major area of responsibility for an Inova clinical manager. *Id.* The job description lists other qualifications with corresponding percentage ranges. Among these qualifications were physical tasks such as "bending occasionally (2%-33% of the time)"; "lifting up to 50 lbs. with or without assistance occasionally (2%-33% of the time)"; and "stooping (bend at waist) occasionally (2%-33% of the time)." *Id.* at 13-14.

Plaintiff was unable to perform certain of these physical qualifications, including bending occasionally (2%-33% of the time) and lifting up to 50 pounds with or without assistance occasionally (2%-33% of the time). *Id.* at 14. Plaintiff's doctor evaluated her condition on May 13, 2020 and May 30, 2020, and notes from those dates suggest that Plaintiff faced physical restrictions in squatting, bending, kneeling, and putting stress on her lower extremities. *Id.* Beginning around September 5, 2018, as part of her job Plaintiff performed supervisory field visits in which she entered patients' homes and observed other clinicians administer treatment to patients. *Id.* During one of these supervisory field visits, the nurse was unable to draw the patient's

2

blood, so Plaintiff instead drew the patient's blood herself.  *Id.*  Because clinicians performed visits in patients' homes, the layout of a patient's home affects Plaintiff's ability to perform at least some duties.  Defendants contend that some layouts would impede Plaintiff's ability to conduct supervisory and direct care field visits to the same extent while Plaintiff argues that supervisory duty demands are "substantially different."  *Id.*

The COVID-19 pandemic began to affect the United States in the spring of 2020.  Facing a staffing shortage, Inova Home Health on May 4, 2020 informed Plaintiff that all internal office staff, including clinical managers, would be required to perform field visits that existing field staff were unable to cover.  *Id.*  On May 13, 2020, Plaintiff, citing limitations caused by her knees, requested an accommodation excusing her from field visits.  *Id.*  A couple of days later, on May 15, 2020, Inova official Joan VanZant offered Plaintiff the option to screen patient field visits and select those field visits that she believed were consistent with her alleged limitations.  *Id.* at 15. Under the terms of this offer, Plaintiff would not have been required to conduct back-to-back home visits.  *Id.*  On June 5, 2020, and in response to notes received from Plaintiff's doctor, Inova administrator Kathleen Nesterick extended Plaintiff a similar offer: Plaintiff could screen patients to ensure that the field visits she attended were consistent with her physical limitations.  *Id.* Nesterick also invited Plaintiff to propose any other  alternative arrangement—with the exception of one that would have her avoid all patient field visits.  *Id.*

On June 9, 2020, Plaintiff declined the plan proposed by Joan Vanzant and reiterated her request not to perform field visits.  *Id.*  On June 12, 2020, Nesterick again offered Plaintiff the option of screening patients to ensure that field visits could be handled consistent with her restrictions.  *Id.*  The parties' discussions were at an impasse; Inova Home Health did not offer a different accommodation, and Plaintiff did not identify a different proposal.  *Id.*  By June 22, 2020,

Nesterick delivered an ultimatum: Plaintiff would need to begin completing patient field visits by June 24, 2020, and if she did not, Inova Home Health would consider Plaintiff to have abandoned her job. *Id.* The following day, Plaintiff removed certain items from her office. Although Plaintiff asserts she was originally scheduled to complete one field visit before the patient's spouse rescheduled the visit, it is undisputed that Plaintiff did not complete any field visits over the next few days. Then, on June 25, 2022, Nesterick informed Plaintiff that her employment at Inova Home Health had ended. *Id.* at 16. Another nurse, Emma Marshall, also saw her employment with Inova Home Health end around this same time. This nurse, like Plaintiff, also did not perform any patient field visits before her employment ended. *Id.*

On March 10, 2021, Plaintiff filed a Complaint in this Court. Dkt. 1. Plaintiff brings four causes of action in her Complaint, three under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and one under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. Count One of the Complaint raises a claim for denial of reasonable accommodation under the ADA. Count Two alleges discrimination based on disability and Count Three alleges retaliation, both under the ADA. In Count Four Plaintiff alleges she was subjected to age discrimination in violation of the ADEA.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is appropriate only if the record shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Hantz v. Prospect Mortg., LLC*, 11 F. Supp. 3d 612, 615 (E.D. Va. 2014) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one 'that might affect the outcome of the suit under the governing law.' A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" *Hantz*, 11 F. Supp. 3d at

615-16 (quoting *Spriggs v. Diamond Auto. Glass*, 242 F.3d 179, 183 (4th Cir. 2001)). The moving party bears the "initial burden to show the absence of a material fact." *Sutherland v. SOS Intern., Ltd.*, 541 F. Supp. 2d 787, 789 (E.D. Va. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists." *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

On summary judgment, a court reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan*, 572 U.S. at 657); *McMahan v. Adept Process Servs., Inc.*, 786 F. Supp. 2d 1128, 1134-35 (E.D. Va. 2011) (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). This is a "fundamental principle" that guides a court as it determines whether a genuine dispute of material fact within the meaning of Rule 56 exists. *Jacobs*, 780 F.3d at 570. "[A]t the summary judgment stage[,] the [Court's] function is not [it]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A factual dispute alone is not enough to preclude summary judgment. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A "material fact" is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). The substantive law determines whether a fact is considered "material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a "material

fact" arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor.  *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

Although Plaintiff brought four claims in her Complaint, her opposition to Defendants' summary judgment motion does not present any argument in support of Count Four.  Generally, a party abandons claims when she fails to defend them in opposition to a motion for summary judgment.  *See, e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008); *Oliver v. Baity*, 208 F. Supp. 3d 681, 690 (M.D.N.C. 2016) (collecting cases); *Williams v. Silver Spring Vol. Fire Dep't*, 86 F. Supp. 3d 398, 419 (D. Md. 2015) (collecting cases and dismissing claim abandoned in summary judgment briefing); Buggs *v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").  No unusual circumstances warrant departing from that general rule in this case.  Therefore, Plaintiff has conceded her claim of age discrimination under the ADEA.  The Court next turns to the remaining counts of the Complaint under the ADA.

### A. ADA Failure-to-Accommodate Claim (Count I)

Plaintiff's first claim alleges Defendants failed to accommodate her disability in violation of the ADA.  To maintain a claim under the ADA for failure to provide a reasonable accommodation, a plaintiff must prove as part of her *prima facie* case "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citing *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

Although applicable to other theories of relief under the ADA, "[t]he *McDonnell Douglas* test is inapposite in a failure-to-accommodate case because a failure-to-accommodate case does not require proof of the employer's motives." *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959 n.2 (4th Cir. 2021) (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1049 (10th Cir. 2017)).  If a plaintiff makes a *prima facie* showing, her employer may defeat the failure-to-accommodate claim by "demonstrating that the reasonable accommodations would impose an undue hardship." *Perdue*, 999 F.3d at 959.  Because Defendants acknowledge that the first two elements of Plaintiff's *prima facie* case are satisfied, the next question is whether Plaintiff could have performed the essential elements of her position with a reasonable accommodation.  *See Wilson*, 717 F.3d at 345.

### 1. Reasonable Accommodation

In determining whether Plaintiff could have performed the essential duties of her job with a reasonable accommodation, the Court undertakes two inquiries.  First, the Court asks, "was the specific accommodation requested by [Plaintiff] reasonable?'" *Jacobs*, 780 F.3d at 580.  Next, the Court asks, had Defendant granted the accommodation, "could Plaintiff have performed the essential functions of the position?" *Anderson v. Sch. Bd. of Gloucester Cty.*, No. 3:18-cv-745, 2022 WL 732231, at *9 (E.D. Va. Mar. 10, 2022).

According to Defendants, Plaintiff's failure-to-accommodate claim fails because the accommodation she requested sought to *eliminate* one of her essential job functions.  Plaintiff counters that direct patient care field visits were not an essential function of her job, and therefore, that her refusal to perform those visits does not undermine her *prima facie* case.

The ADA's implementing regulations cover a non-exhaustive list of factors that this Court considers in deciding whether a job function is truly essential.  These factors are:

(i)  The employer's judgment as to which functions are essential;
(ii)  Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)  The amount of time spent on the job performing the function;
(iv)  The consequences of not requiring the incumbent to perform the function;
(v)  The terms of a collective bargaining agreement;
(vi)  The work experience of past incumbents in the job; *and/or*
(vii)  The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)-(vii) (emphasis added); *see also Serrano v. Cty. of Arlington*, 986 F. Supp. 992, 1000-01 (E.D. Va. 1997) (considering these factors in its essential functions analysis). Under the regulations, no one factor is dispositive in determining whether a function is essential.

As for the first factor, Inova Home Health deemed the patient field visit-related functions of Plaintiff's job essential.  The ADA states expressly that "consideration shall be given to the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  This factor tips in favor of finding that completing patient field visits was an essential function of Plaintiff's job.

Next, the job description Plaintiff received when she began her employment with Inova Home Health describes performing field visits as an essential function, as well as a "Major Area of Responsibility."  *See* Dkt. 34-8 at 3.  Although Plaintiff emphasizes differences between the language of the two descriptions and interprets this variation to mean that performing field visits were only a major area of responsibility for Plaintiff, this argument fails for several reasons.  First, there is very little daylight between the wording of the two descriptions, but to the extent they differ it is not clear that only the "major area of responsibility" function refers to field nursing tasks.  *Compare id.* ("Completes field visits as needed providing direct patient care upon Administrator discretion") *with id.* ("Works according to designated hours and on-call as needed in office and field nursing responsibilities").  The former portion, described as a major area of responsibility in Plaintiff's job description, suggests that field visits would be required on a

contingent basis.  The latter portion, referencing an essential function, does the same.  Second, it appears that the "essential function" and "major area of responsibility" portions of Plaintiff's job description are mutually reinforcing rather than mutually exclusive, which suggests they should be read together.  This is true of both the field nursing tasks at issue and other parts of Plaintiff's job description.  *See id.* (listing "Maintains active RN license in Virginia" as a major area of responsibility and "Current applicable license as an RN" as an essential function).  Consequently, this second factor points toward a finding that patient field visits were indeed an essential function of Plaintiff's role.

The next factor looks to the amount of time spent on the job performing the function. Central to the parties' disagreement is a delta between the formalized requirements of Plaintiff's supervisory role and the parties' informal practice before the COVID-19 pandemic began.  There is little doubt that essential parts of Plaintiff's clinical manager role included patient field visit tasks, which included bending, lifting, and stooping requirements.  There is also little doubt that between 2018 and the spring of 2020, Plaintiff rarely—if ever—actually performed these tasks. This factor therefore cuts against a finding that these patient field visit-related tasks were essential functions of Plaintiff's position.

The fourth factor concerns the consequences of not requiring Plaintiff to perform the function.  As the COVID-19 pandemic wore on, Inova Home Health encountered a dire problem: some of its nursing staff resigned as healthcare workers faced seemingly interminable challenges in treating patients who contracted the virus; among the remaining nursing staff, some were unable to report to work due to their exposure to COVID-19 or because they had contracted the virus themselves.  The summary judgment record reveals that this staffing shortage posed acute problems for Inova Home Health's ability to meets its mission of administering care in patients'

homes.  This fact was not lost on Plaintiff, who acknowledged that a delay in providing care—in drawing the patient's blood, for example—could have negative consequences for a patient.  *See* Dkt. 33-1.  Little imagination is required to contemplate the real-world consequences of a healthcare provider failing to provide timely care to homebound patients in the early, uncertain months of the global pandemic.  Based on the undisputed facts in evidence, the Court finds that this factor suggests the patient field visit-related physical tasks at issue were essential functions of Plaintiff's job.

No collective bargaining agreement is present in this case; thus, the Court turns to the final two 29 C.F.R. § 1630.2(n)(3) factors: the work experiences of past incumbents in the job and/or the current work experience of incumbents in similar jobs.  In other words, the Court looks to the experiences of former and current employees who held or hold a clinical manager role.  The summary judgment record shows that that Inova Home Health's supervisory staff rarely performed direct care patient visits before the COVID-19 pandemic; viewed in isolation, this fact tends to suggest that the sort of physical tasks Plaintiff did not wish to perform were not essential functions of her position.  The record also reflects, however, that similarly situated employees were expected to perform such tasks when the pandemic's staffing shortage necessitated it.  And as a matter of course, Inova Home Health required that employees in the clinical manager position receive yearly competency training.  This mandate signals that field visits, though perhaps not regularly required by those serving in Plaintiff's position, were important enough features of the job that the company provided annual training on them.  What is more, other clinical supervisors did in fact perform field visits when the need arose in 2020.  For these reasons, the sixth factor under the ADA's implementing regulation sits in equipoise, while the seventh and final factor points toward a finding that these tasks were essential functions of Plaintiff's role.

Ultimately, the Court's task is to determine whether about two years of lax enforcement of what had always been previously deemed essential functions meant that by the time the pandemic began, these tasks enumerated in Plaintiff's job description were no longer essential functions of her job. Although Plaintiff faults her job description for being vague, for relying on percent ranges for certain activities, and maintains that she was repeatedly assured by Inova Home Health superiors that her position would be exclusively supervisory in nature when she assumed the role in 2018, it remains undisputed that Plaintiff's job required these tasks at all times relevant to this case. Weighing all of the factors articulated in the ADA's implementing regulations, the Court concludes that these tasks remained essential functions of Plaintiff's role in the spring of 2020.

Therefore, the only solution Plaintiff proposed—abstaining from field visits entirely—was not a reasonable accommodation because it would have eliminated an essential function of her job. Having determined that Plaintiff's favored accommodation was not a reasonable one, the Court next must determine whether Plaintiff could have performed the essential functions of her role if her request had been granted. The answer to the first inquiry also resolves the second.

The undisputed facts show that Plaintiff would not have been able to perform essential functions of her position if Defendants had granted her request to refrain entirely from going into the field to perform patient home visits. An employee who cannot meet the physical requirements of an essential job function is not qualified for the position. *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1010 (4th Cir. 2020). Reassigning an employee to "permanent light duty" is not mandated by the ADA. *Shin v. Univ. of Maryland Med. Sys. Corp.*, 369 F. App'x 472, 482 (4th Cir. 2010) (quoting *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir. 1987)). "Nor does [the ADA] require an employer to 'reallocate job duties in order to change the essential functions of a job,' 29 C.F.R. Pt. 1630 App. § 1630.2(o), or 'hire an additional person to perform an essential function

of a disabled employee's position.'" *Shin*, 369 F. App'x at 482 (quoting *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 687 (4th Cir. 1997)).  Therefore, Defendants were under no obligation to meet Plaintiff's demand that she be excused from performing field visits entirely.

### 2. Employer's Refusal to Provide Reasonable Accommodation

For the reasons that follow, this Court finds that Defendants did not refuse to offer Plaintiff a reasonable accommodation.  The record shows that on May 15, 2020, Defendants first offered Plaintiff the option to screen patient field visits and to accept only those visits Plaintiff believed she could complete with her physical limitations.  Defendants' agents communicated substantially similar offers to Plaintiff on June 5, 2020 and June 12, 2020.  Defendants' reasonable accommodation afforded Plaintiff exclusive discretion to choose to perform only those patient field visits she felt comfortable performing.

Several features of the reasonable accommodation Defendants offered are notable.  First, before deciding whether to take on a particular patient field visit, Plaintiff could review the patient's chart to evaluate treatment needs.  Second, Plaintiff could review information related to the layout of the patient's house, or the location where care was provided, and determine whether those details raised concerns about her ability to administer care given her restrictions.  If any of these particulars gave Plaintiff pause, she could speak to a clinician who had previously provided care to the patient.  And finally, under the plan Defendants proposed, Plaintiff would be able to perform many tasks while sitting or standing, eliminating any interference with her restrictions.

From Plaintiff's perspective, this accommodation would prove insufficient in light of the ongoing risk that her physical restrictions might leave her capable of addressing an unexpected event at a pre-screened patient field visit.  Her fear is that if a mishap were to occur, the safety of Plaintiff and patient alike would be endangered.  The record shows that Plaintiff's disability does

not render her unable to address all contingencies; for example, on at least one occasion she drew a patient's blood when the clinician she was supervising could not.  Putting that aside, for those emergencies Plaintiff might be unable to address due to her physical limitations, she would remain free to seek assistance from a family member, call Inova Home Health to request back-up, or call 911.  Plaintiff's objection to Defendants' proposed accommodation on the ground that it purportedly failed to adequately account for unexpected events during a patient field visit, therefore, does not make it unreasonable.

Much of Plaintiff's argument centers on the fact that the plan Defendants proposed was identical to, or closely resembled, an option Inova Home Health extended to any staff member. Because she was offered a screening policy available to all other internal staff, Plaintiff argues, the accommodation Defendants offered was ineffective.  But this reasoning mistakes the nature of a qualified individual's legal entitlement under the ADA. An employer's reasonable accommodation is *ipso facto* not ineffective simply because the employer also offers that same accommodation to other employees.  For example, in *Yochim v. Carson*, 935 F.3d 586, 592 (7th Cir. 2019), an employee declared that because many of her employer's options "already were widely available to HUD employees without a reasonable accommodation," they "were not 'alternative accommodations.'"  Rejecting this argument, *Yochim* observed that "[i]t makes no difference that" the employer's options "might have been available to other HUD employees who obtained permission to telework from their manager."  *Id.*  The same logic applies here, where Plaintiff's employer has apparently extended its home visit screening policy to all internal staff.  In so doing, Defendants have set a baseline level of accommodation for members of its staff.  That the reasonable accommodation was not specially devised for Plaintiff and Plaintiff alone does not make it inadequate under the ADA.

The Court also examines Plaintiff's claim that Defendants failed to engage in the ADA-mandated interactive process. The evidence shows that Plaintiff requested an accommodation for a disability, which triggered her employer's "duty to engage in an interactive process to identify a reasonable accommodation." *Wilson*, 717 F.3d at 346. Defendants offered Plaintiff a reasonable accommodation, which she rejected. The statute confers upon qualified individuals a right to a reasonable accommodation, not a perfect accommodation preferred by an employee. *See Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 433 (4th Cir. 2015). "An employer may reasonably accommodate an employee without providing the exact accommodation that the employee requested." *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 415 (4th Cir. 2015). This standard is consonant with the law's recognition that an employer "has the ultimate discretion to choose between effective accommodations." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019).

When an employee rejects a reasonable accommodation, she can no longer be considered a "qualified individual with a disability." *Andrews v. Commonwealth of Virginia*, 232 F.3d 886 (4th Cir. 2000). And when Defendants gave Plaintiff the chance to propose some other accommodation that might still permit her to perform all the essential functions of her job, including field visits, she proposed no alternative. Although Plaintiff claims at summary judgment that she should have been permitted to perform direct field visits with another clinician, the record reflects that she never raised this potential alternative during the interactive process. For one, this potential accommodation seems suspect at best given that a staffing shortage was Defendants' very reason for ordering clinical supervisors like Plaintiff into the field in the first place. But even if this potential accommodation were reasonable, there is reason to doubt Plaintiff would have accepted this solution. The record shows that Plaintiff testified she would not have accepted any accommodation short of being excused from performing field visits entirely:

Q: [A]nd you're affirmatively stating that you're not going to see patients in the field by providing direct care, correct?
A. It says I'm not willing to take the risk, so I would say --
Q. Correct?
A. -- yes.
Q. Thank you.
A. I would say yes.

*See* Dkt. 33-1.  In any event, Plaintiff's claim that Defendants failed to engage in the interactive process is unsupported by the record.  Plaintiff has therefore failed to establish this fourth element of her *prima facie* case.  Because Plaintiff has failed to make a *prima facie* case, summary judgment is appropriate on her failure-to-accommodate claim under the ADA.

### B. ADA Discrimination (Count II)

Plaintiff also maintains she was subjected to disability discrimination in violation of the ADA.  To make out a *prima facie* case of disability discrimination, Plaintiff must show that (1) she was a qualified individual with a disability; (2) she suffered an adverse employment action; (3) she was meeting her employer's legitimate expectations at the time of the adverse employment action; and (4) the circumstances of the adverse employment action raise a reasonable inference of unlawful discrimination.  *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) .

In cases such as this one, where the plaintiff proceeds with circumstantial rather than direct evidence, the *McDonnell Douglas* burden-shifting framework governs an ADA discrimination claim.  *See Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 336 (4th Cir. 2022) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under that framework, if a plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory justification for taking the employment action at issue.  *Hannah P.*, 916 F.3d at 347.  If the defendant meets this burden, the

burden then shifts back to the plaintiff, who must demonstrate that the defendant's stated reasons are pretextual.  *Id.*

### 1. Plaintiff's *Prima Facie* Case of Failure-to-Accommodate

Plaintiff cannot establish that she was qualified for her position.  Because she was unable to perform the essential functions of her job, she is not considered a qualified individual under the ADA.  *See Elledge*, 979 F.3d at 1010.  Accordingly, Plaintiff cannot establish the first element of her *prima facie* claim of disability discrimination.

Turning to the second element of Plaintiff's *prima facie* case, the Court finds there is sufficient evidence in the record to find that her termination qualifies as an adverse employment action.  Although Defendants argue that she abandoned her position, the undisputed material facts show that Plaintiff was informed through at least three written notices that she would no longer be employed by Defendants if she did not perform direct patient care field visits.  And on June 25, 2020, Kathleen Nesterick confirmed that Plaintiff's employment with Inova Home Health had ended.  On this record, the Court finds that Plaintiff was terminated from her role.  A termination is unquestionably an adverse employment action.  *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (citing *Hartsell v. Duplex Prod., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997)).

Next, as part of her *prima facie* case, Plaintiff must show that she was meeting her employer's legitimate expectations at the time of relevant adverse employment action.  *See Reynolds*, 701 F.3d at 150.  The record reveals that at the time of Plaintiff's termination, Inova Home Health expected all staff who typically worked in supervisory, internal office roles to assist in performing field visits.  Plaintiff did not agree to perform, and in fact did not perform, any field visits when Defendants asked her to do so in 2020.  Defendants' expectation was legitimate, and

Plaintiff's failure to meet it means that she cannot establish the third element of her *prima facie* case.

Finally, Plaintiff is required to identify circumstances that give rise to a reasonable inference of discrimination. There are no such circumstances in the record. Defendants extended Plaintiff a reasonable accommodation and participated in the interactive process as the ADA requires. Plaintiff refused this reasonable accommodation. Furthermore, the Court has found—and Plaintiff appears to acknowledge—no evidence that any employee of Defendants disparaged Plaintiff for requesting an accommodation. *See* Dkt. 33-1.

### 2. Defendants' Burden of Production

For the reasons stated above, Plaintiff has not proved a *prima facie* case of disability discrimination. Even if she had, however, Defendants have presented a legitimate, non-discriminatory reason for ending her employment. After rebuffing earlier requests by Defendants, Plaintiff resisted a direct instruction to complete field visits by June 24, 2020, or risk termination. Her refusal constitutes a legitimate, non-discriminatory ground for termination, and Defendants therefore carry their burden under this stage of the *McDonnell Douglas* framework even if Plaintiff could make out a *prima facie* case of discrimination under the ADA.

### 3. Plaintiff's Burden of Persuasion

To ultimately prevail on her disability discrimination claim, Plaintiff must establish pretext. To do this, with respect to her termination she must show "both that the reason advanced was a sham and that the true reason was an impermissible one under the law." *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1235 (4th Cir. 1995). The record contains no evidence that Defendants harbored a discriminatory motive in terminating Plaintiff, or that they implemented a hidden purpose in terminating her on the basis of her physical limitations or some other unlawful reason.

17

Neither has Plaintiff shown Defendants' stated reasons for terminating her employment to be so disconnected from fact that they are unworthy of credence.  Yet to establish pretext "in the Fourth Circuit, as elsewhere, a plaintiff must do more than demonstrate that an employer's belief is incorrect; plaintiff must present evidence reasonably calling into question the honesty of the employer's belief."  *Tomasello v. Fairfax Cty.*, No. 1:15-cv-95, 2016 WL 165708, at \*11 (E.D. Va. Jan. 13, 2016) (citing *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

Although Plaintiff points to three comparators who she alleges were never called into the field, none of these individuals were similarly situated to Plaintiff.  To be deemed valid comparators, employees must be "similarly situated in all respects."  *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019) (describing standard under Title VII discrimination claims); *see also Swann v. US Foods, Inc.*, No. 1:14-cv-01409, 2015 WL 3793739, at \*9 (E.D. Va. June 17, 2015) (assessing comparator standard under the ADA).  The three comparators Plaintiff identifies—Ugo Agwu, Christine Nyambati, and Clarice Pollard—were all fully remote employees.  This fact alone means that they were not subject to the same standards as Plaintiff and therefore were not similarly situated.  Further, it appears that Agwu had not even been trained to conduct field visits in patients' homes at the time Defendants required Plaintiff to perform such visits.  Moreover, the record shows that one of Plaintiff's fellow clinical supervisors, Emma Marshall, also refused to conduct field visits.  *See* Dkt. 33-1 at 55.  Marshall's experience further undermines Plaintiff's case, however.  For one, there is no evidence in the record that Marshall was a qualified individual with a disability.  Assuming she was disabled, Defendants offered the precise same accommodation to Marshall they offered to Plaintiff.  And when Marshall refused to perform field visits even with this accommodation, she too was terminated.

For these reasons, Plaintiff cannot establish pretext; summary judgment will therefore be entered against Plaintiff's ADA discrimination claim.

## C. ADA Retaliation (Count III)

Plaintiff's ADA retaliation claim proceeds under the same *McDonnell Douglas* framework as her disability discrimination claim.  *See Lamb v. Boeing*, 213 F. App'x 175, 179 (4th Cir. 2007) ("Retaliation claims function in parallel.").  First, Plaintiff must make out a *prima facie* case of retaliation, which requires her to prove that: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) the adverse action was causally connected to her protected activity.  *See A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011).

### 1. Plaintiff's *Prima Facie* Case of Retaliation

Defendants assume for purposes of summary judgment that Plaintiff engaged in a protected activity but contest the remaining elements of Plaintiff's *prima facie* case of retaliation.

Viewing the facts in the light most favorable to Plaintiff, the non-moving party, the Court finds that Plaintiff engaged in protected conduct when she requested to be accommodated. Requesting an accommodation is a protected activity.  *See Jacobs*, 780 F.3d at 577 (holding that a plaintiff "clearly engaged in protected activity by submitting a request for accommodation."). Furthermore, Plaintiff suffered an adverse action when she was terminated.  At the *prima facie* stage of an ADA retaliation claim, this event constitutes an adverse action.  *Id.* (holding that employer "clearly took an adverse employment action by firing" employee).

Turning to causation, Plaintiff must show that her disability was the "but-for" cause of her employer's decision to terminate her.  *See Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 234 (4th Cir. 2016) (stating that the "but-for" causation standard applies in ADA cases).  Here, Plaintiff maintains that Inova Home Health terminated her employment on the basis for her

19

physical limitations.  The Court notes that there is a relatively short time period between Plaintiff's protected activity of requesting an accommodation on May 13, 2020 and her termination on June 24, 2020.  Such close temporal proximity gives rise to an inference of causation at the *prima facie* stage of Plaintiff's ADA retaliation claim.  *See Miller v. Md. Dep't of Nat. Res.*, 813 F. App'x 869, 879 (4th Cir. 2020) (deeming a similar time period between the accommodation request and the termination "weighs heavily in favor of finding at least a genuine dispute as to causation").  The Court finds that Plaintiff has set forth a *prima facie* case of retaliation under the ADA.

## 2. Defendants' Burden of Production

When a plaintiff establishes a *prima facie* case, the burden then shifts to defendant, who must "rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions."  *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 298 (4th Cir. 2004).  Here, Defendants have provided a legitimate, nonretaliatory reason for terminating her employment, and no genuine issue of material fact calls that reason into question as pretext.  The record is clear that Defendants repeatedly stated that their reason for ending Plaintiff's employment was her refusal to complete field visits as directed.

## 3. Plaintiff's Burden of Persuasion

After a defendant has stated a legitimate, nonretaliatory reason for taking adverse employment action, the burden shifts back to the plaintiff to show that the employer's stated reason is pretext for unlawful retaliation.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).  In this case, because Defendants have carried their burden of production, the presumption created by Plaintiff's *prima facie* case "'drops out of the picture,' and the burden shifts back to the employee to present evidence from which a reasonable juror could find that the

20

proffered reason was a pretext for discrimination or retaliation." *Burgess v. Bowen*, 466 F. App'x 272, 277 (4th Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

The sole fact Plaintiff marshals in support of her pretext argument is Kathleen Nesterick's statement that she terminated Plaintiff not because Plaintiff declined to see a patient, but rather because Plaintiff had cleared out her office on June 23, 2020, or alternatively that perhaps both causes played a role.   But the summary judgment record shows that Nesterick herself unambiguously informed Plaintiff on June 22, 2020—in what she described as a "final warning"— that unless Plaintiff began to complete field visits as directed, her employment with Inova Home Health would end on June 24, 2020.  Therefore, despite Plaintiff's suggestion that Defendants gave shifting reasons for her termination, there is no evidence of pretext in the summary judgment record.  That fact sets this case apart from those in which courts have found an employer's stated reasons for taking adverse employment action against an employee to be pretextual.  *See, e.g.*, *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 646 (4th Cir. 2002) (discussing how a shift both in the detail and the explanation for the employer's decision gave them "the flavor of post-hoc rationalizations"); *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (holding that an employer's inconsistent explanations and different justifications were probative of pretext).

Faced with the evidence in the record, no reasonable factfinder could conclude that Defendants, who faced a difficult staffing situation in the early months of the COVID-19 pandemic, retaliated against Plaintiff for requesting a reasonable accommodation under the ADA. Instead, it was Plaintiff's refusal to perform field visits at all that caused Defendants to end her employment.  Summary judgment will be granted as to Plaintiff's ADA retaliation claim.

IV. CONCLUSION

For these reasons, it is hereby ORDERED that Defendants' Motion for Summary Judgment (Dkt. 32) is GRANTED as to all counts in Plaintiff's Complaint (Dkt. 1).[1]

The Clerk is directed to enter judgment for Defendants pursuant to Federal Rule of Civil Procedure 58, vacate the pretrial hearing and trial date from the Court's docket, and close this civil action.

It is SO ORDERED.

Alexandria, Virginia
June 21, 2022

_____ /s/
Rossie D. Alston, Jr.
United States District Judge

---

[1] Another motion for summary judgment separately appears on the docket.  *See* Dkt. 31. The Clerk's office issued a notice of correction advising Defendants that the motion for summary judgment would need to be filed as a separate docket entry from the brief in support of the motion, which Defendants did.  *See* Dkt. 32.  The initial motion (Dkt. 31) is therefore moot.

22